IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

———————————————————————     )
                                          )
Heather Prowse nka Agustin,               )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 ) Civ. No. 21-00057 ACK-WRP
                                          )
ALEJANDRO MAYORKAS, U.S.                  )
Secretary of the Department of            )
Homeland Security,                        )
                                          )
              Defendant.                  )
———————————————————————     )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 35)**

After she believed she was overlooked for multiple promotions, Transportation Security Administration ("TSA") employee Plaintiff Heather Prowse nka Agustin ("Agustin") filed a complaint with this Court alleging three causes of action under Title VII: (1) sex discrimination, (2), retaliation, and (3) race discrimination.  ECF No. 1, Compl. ¶¶ 26-38.  Defendant Alejandro Mayorkas has moved for summary judgment on all three claims.  ECF No. 35.

For the reasons discussed below, the Court GRANTS Defendant Mayorkas's Motion for Summary Judgment, ECF No. 35.

## BACKGROUND

The following facts are principally drawn from the Parties' Concise Statements of Fact ("CSF"), ECF Nos. 36, 40, and 46.

## I.  Factual Background

Agustin began her career with TSA in 2006 as a Transportation Security Officer ("TSO") in Phoenix, Arizona, became a Behavior Detection Officer ("BDO") in 2008, and was promoted to Supervisory BDO ("SBDO") in 2015.  Enoka Decl. ¶ 4. As a TSO, Agustin was responsible for passenger checkpoint screening operations.  Id. ¶ 5.  When she became a BDO, Agustin was trained to watch passengers and report and resolve any suspicious behavior.  Id.  Agustin worked as a member of the Program Compliance Assessment team, where she assessed BDOs at other airports.  See Def. Ex. 6.

In March of 2015, Agustin requested and received a transfer as a SBDO at the Daniel K. Inouye International Airport in Honolulu, Hawaii ("HNL").  Enoka Decl. ¶ 6.  At HNL, Agustin supervised a team of BDOs and remained a member of the Program Compliance Assessment team.  See Def. Ex. 6.  Over the course of Agustin's employment with TSA, she received praise for her work and received good evaluations.  Compl. ¶¶ 9, 24.

In 2016, Bill Daley, the HNL Deputy Assistant Federal Security Director for Screening, approved Agustin and two other

2

SBDOs at HNL for 3% raises.  Enoka Decl. ¶ 7.  Due to a
technical error, Agustin retroactively received the 3% raise
effective August 7, 2016, whereas the two other SBDOS received
the raise effective July 24, 2016.  Id. ¶¶ 8, 9.  Agustin
inquired as to the reason for the delay and sent an email to
Regional Director Jerry Agnew, who was based out of Arizona,
expressing her frustration.[1/]  Agnew Decl. ¶ 5.  Because Agnew
had no knowledge of the details of Agustin's raise, he forwarded
Agustin's email to Jenel Cline, Mark Momsen, and Cy Okinaka.
Id. ¶¶ 5, 6.  Daley and Lalanya Fair were copied on an earlier
email from Cheryl Enoka to Agustin about the delay, but not
Agustin's subsequent email forwarding the issue to Agnew.  See
Pl. Ex. A.

Agustin's email to Agnew stated that she thought that
someone, without naming who, had deliberately made an error on
her form, see Def. Exs. 1 & 2, but she did not explicitly state
that she believed the delay was discriminatory.  Agustin argues
it was inferred in her email that there was unfair treatment.
Augustin Decl. ¶  8.

---

[1/]  In Agustin's email to Agnew, she told him that she had been informed
by her management team that the pay increase would go into effect for pay
period 15, starting August 21, 2016; and that the other two SBDOs were given
the 3% raise at that time.  See Pl. Ex. A.  In fact, it appears that the
other two SBDOs retroactively received the pay increase on July 24, 2016.
Agustin retroactively received the 3% pay increase on August 7, 2016.  The
clerical error was never corrected to the extent of the 3% raise covering the
two-week period of July 24 to August 7, 2016.

### a. TSA's Job Selection Process

TSA Management Directive 1100.30-26 (Interviews and/or Other Final Selection Processes) governs the process for selecting Transportation Security Managers ("TSMs").  Okinaka Decl. ¶ 4.  For TSM positions at HNL, TSA would post the opening online, and human resources contractors generated a "best qualified" candidate list.  Fair Decl. ¶ 5.  A three-person panel was then convened to interview the "best qualified" candidates using identical questions, and subsequently recommend a candidate for selection to the appointing official.  Id.  The appointing official in this case was Cy Okinaka, who generally deferred to the panel's recommendation.  Okinaka Decl. ¶ 5. Okinaka would only look beyond the recommended applicant if he saw a reason to question the applicant's qualifications.  Id.

### b. TSA's Non-Selection of Agustin

In early 2016, Agustin applied to TSM Vacancy Announcement HNL-16-984533 ("First TSM Position").  Daley Decl. ¶ 6; see Def. Ex. 4.  As the job posting explained, TSMs are responsible for supervising screeners and managing security incidents at TSA checkpoints, ensuring adherence to all policies and procedures at such checkpoints, and managing checkpoint staffing and scheduling.  Daley Decl. ¶ 6.  Daley was on the panel that interviewed Agustin for the First TSM Position and was also the selecting official.  Id. ¶ 7.

4

Agustin tied for the highest interview score, but Daley ultimately selected and recommended to Okinaka another candidate with more screening experience as opposed to Agustin's behavior detection experience. Id. ¶ 8. As a SBDO, Agustin's daily duties did not involve conducting checkpoint screening operations. Id. Agustin, for her part, believed she was highly qualified as she had experience in baggage and screening when she worked as a TSO for two years. Agustin Decl. ¶ 30. Agustin also had temporary TSM supervisory experience from when she was an acting TSM in Arizona for three months. Compl. ¶ 18.

After Okinaka approved Daley's candidate selection, Daley informed Agustin that if another TSM contemplating retirement did in fact retire while the job posting was still open, he would recommend her for the position as she was ranked second highest overall. Daley Decl. ¶ 9. According to Agustin, Daley told her he was very impressed with her and that she would be given a TSM position at the next opening. Agustin Decl. ¶ 15. Because the retirement was not announced until the job posting had expired, Agustin was required to apply to a new TSM posting. Daley Decl. ¶¶ 9, 10. Agustin asserted Daley had assured her she would get the next TSM position. Agustin Decl. ¶ 15. However, in her email to Alo, Agustin acknowledged Daley had told her she would get the position only if it opened up

5

during the current posting, and no TSM position opened during that posting.  See Pl. Ex. E.

When the new job posting was issued in August of 2016 (TSM Vacancy Announcement HNL-16-167615) ("Second TSM Position"), Agustin again applied.  Unlike the First TSM Position, this posting included "Pax/Bags/Cargo" in the title, meaning that the candidates must demonstrate experience with passenger baggage and cargo screening in addition to the general TSM qualifications.  Fair Decl. ¶¶ 3, 4, see Def. Exs. 5 & 6.

This time, Daley was not on the interview panel but instead created the interview schedule and handled logistics. Daley Decl. ¶ 11.  After Daley scheduled the interviews and reserved a conference room for that purpose, a different candidate withdrew his application.  Id. ¶ 12.  As a result, Daley moved Agustin, who was originally scheduled to be interviewed last, into that slot previously held for the withdrawn candidate, and gave up the later conference room reservation.  Id.; see also Def. Ex. 7.  Due to an email attachment error on Daley's part, the interview panel did not receive the schedule adjustment in time.  Daley Decl. ¶ 13. When Agustin arrived at 8:00 a.m. instead of her original 11:00 a.m. time, she was asked to wait until the interview panel was available.  Id.

Because Daley had canceled the original conference room reservation, Agustin's interview was conducted in Okinaka's office.  Fair Decl. ¶ 11.  Okinaka had a large office with an extended desk and an extra table with chairs for meetings. Okinaka Decl. ¶ 8.  Agustin was seated behind Okinaka's desk, while the panelists sat in the guest chairs on the other side of the desk.  Fair Decl. ¶ 11.  Fair asked Agustin if she was comfortable with this setting, and Agustin answered she was. Id.  Other candidate interviews in the past had been conducted in Okinaka's office.  See Brandon Decl. ¶ 9.

In an effort to make small talk before the interview, Fair inquired about Agustin's pregnancy.  Fair Decl. ¶ 12. Agustin felt this was an unfair and improper question before the interview, and that she was being treated differently from the other interviewees who were not pregnant.  Agustin Decl. ¶ 22.

The interview panel for the Second TSM Position included Fair, Brandon, and Fitzgibbon.  Fair Decl. ¶ 5.  Fair was the selection official for the panel, and accordingly was to make the panel's recommendation for the successful candidate to Okinaka following the panel's interviews.  Id.

After the interview, the panel ranked Agustin in a tie for sixth out of eleven candidates, with a score of 25 out of 30.  Id. ¶ 13; see Def. Ex. 6.  The panel thought that while Agustin demonstrated general management skills, she did not have

7

the operational experience related to screening and baggage that
was specific to this TSM posting.  Fair Decl. ¶ 13.

       The panel ranked Kingston Chan-an Asian male
candidate-first out of the eleven candidates, with a score of 30
out of 30.  Id. ¶¶ 7-9.  The interview panel evaluations and
score cards reflect that Chan demonstrated strong leadership
skills and had solid experience in passenger and baggage
screening.  See Def. Ex. 12.  Chan was selected and recommended
for the position, and Okinaka approved the recommendation.
Okinaka Decl. ¶ 11.

       None of the interview panelists were aware of
Agustin's email to Agnew expressing frustration with her delayed
raise.[2/]  See Fair Decl. ¶ 18; Brandon Decl. ¶ 13; Fitzgibbon
Decl. ¶ 9.  All three panelists were aware that Agustin was
female, pregnant, and Caucasian, but stated that did not factor
into their evaluation.  See Fair Decl. ¶ 17; Brandon Decl. ¶ 12;
Fitzgibbon Decl. ¶ 8.

       When Agustin learned she was not selected for the
Second TSM Position, she complained to her supervisor, Cherise
Alo.  Agustin Decl. ¶¶ 24, 25.  In her email to Alo, Agustin
expressed her frustration that TSA HNL hadn't "hired a female
for the position in at least the last 4 promotions possibly

_____

       [2/] Although, as discussed supra, Fair was copied on an earlier email
from Enoka about the delay, but not Agustin's subsequent email directly to
Agnew.  See Pl. Ex. A.

more," and wondered if her non-selection had "something to do with the complaint [she] made against the HR here when questioning why [her] pay increase took longer than other employees."  See Pl. Ex. E.  Agustin further speculated that "maybe [her] pregnancy has caused them to think otherwise or maybe they feel that with my upcoming maternity leave situation and parental status that someone else would be better suited for the position."  Id.

In response to Agustin's email, Alo agreed that Daley "recalled telling [her] that [Agustin] was next for that vacancy," id., and suggested Agustin meet with Daley to discuss the matter.  Agustin Decl. ¶¶ 24, 25.  As noted earlier, Agustin acknowledged in her email to Alo that Daley told her when she was not selected for the First TSM Position she would get the position if it opened up during the current posting, and that opening did not happen.

## II.  Procedural History

Prior to filing her Complaint in this Court, Agustin exhausted her administrative remedies on February 21, 2017 when she filed an Employment Opportunity ("EEO") complaint alleging Title VII violations of sex discrimination, pregnancy discrimination, race and retaliation when Defendant failed to promote her.  Compl. ¶ 5.  After Agustin's EEO complaint was dismissed without a hearing, id. ¶ 6, she was given a right to

9

file a civil suit in federal district court within 90 days of October 27, 2020.  Id. ¶ 7.

On January 22, 2021, Agustin filed a complaint with this Court against David Pekoske in his official capacity as Acting Secretary of the United States Department of Homeland Security ("DHS"), ECF No. 1.  On November 24, 2021, Defendant Alejandro Mayorkas[3] moved for summary judgment on all three Title VII claims, ECF No. 35.  Defendant also submitted a CSF in support, ECF No. 36.  Agustin filed her Opposition, ECF No. 41, and a CSF in Opposition, ECF No. 40, on January 18, 2022.  On January 27, 2022, Defendant filed his Reply, ECF No. 45, and further CSF in support, ECF No. 46.  A hearing on the Motion was held on February 10, 2022.

## STANDARD

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear

---

[3] Alejandro Mayorkas was sworn in as Secretary of the Department of Homeland Security by President Biden on February 2, 2021 and was therefore substituted for David Pekoske as the defendant in this suit pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted and emphasis removed); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find

for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (internal citation and quotation omitted)).

## DISCUSSION

As discussed above, the Court must decide whether to grant Defendant summary judgment on Agustin's three Title VII claims.  The Court first addresses the discrimination claims, and then moves on to Agustin's retaliation claim.  For the reasons set forth below, the Court GRANTS Defendant's motion for summary judgment.

### I.  Title VII Discrimination Claims (Counts I & III)

Defendant first moves for summary judgment on Agustin's Title VII discrimination claims.  Agustin sees her case as intersectional discrimination because she is a Caucasian

12

female who was pregnant at the time of her interview and non-selection.  Opp. at 8; see Lam v. Univ. of Haw., 40 F.3d 1551 (9th Cir. 1994) ("[W]hen a plaintiff is claiming race and sex bias, it is necessary to determine whether the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or of the same sex.").

Title VII, as amended in 1978, includes the Pregnancy Discrimination Act, which provides that sex discrimination includes discrimination based on "'pregnancy, childbirth, or related medical conditions; and women affected by [these conditions] shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.'"  Davis v. Frank, 962 F.2d 13, No. 91-55792, 1992 WL 99343, at *2 (9th Cir. May 11, 1992) (quoting 42 U.S.C. § 2000e(k)).  At the hearing, upon being questioned by the Court, and after reviewing the EEOC complaint to see whether disparate treatment or disparate impact was specified-and finding neither was-Agustin's counsel responded that Agustin is pursuing both disparate impact and disparate treatment theories of discrimination.

### a. Disparate Treatment

To establish disparate treatment under Title VII, a plaintiff "must offer evidence that gives rise to an inference

of unlawful discrimination either through the framework set forth in McDonnell Douglas Corp. v. Green or with direct or circumstantial evidence of discriminatory intent." Freyd v. Univ. of Oregon, 990 F.3d 1211, 1228 (9th Cir. 2021) (internal quotations and citation omitted).

The McDonnell Douglas framework contains three burden-shifting steps. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). If Agustin can establish a prima facie case of discrimination, the burden shifts to Defendant to show a non-discriminatory justification for the challenged action, and then back to Agustin to show that the proffered justification is pretextual. Id. Defendant argues that Agustin is unable to establish a prima facie case of disparate treatment, and even if she could, she has failed to show pretext. Mot. at 15-17. The Court agrees.

### i. Prima Facie Case

At the first step of the McDonnell Douglas framework, Agustin must make a prima facie case of discrimination, which requires a showing that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [the] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside h[er] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."

Fonseca v. Sysco Food Servs. Of Ariz., Inc., 374 F.3d 840, 847 (9th Cir. 2004) (quoting Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004)).  If the case is made, then the burden shifts to the Defendant to articulate a legitimate non-discriminatory reason and then the burden shifts back to establish that the Defendant's proffered justification is pretextual.

As evidence of discrimination, Agustin offers several allegations:  (1) she was informed by Daley that her interview time had changed, but the panel was not ready for her at the earlier time; (2) she was visibly pregnant at the time; (3) she had to interview in an office instead of in a conference room like the other candidates; and (4) the person selected for the vacancy was a less qualified Asian male.  See Compl. ¶¶ 17, 18, 19, 31.  None of these allegations-alone or in combination-is sufficient to raise a genuine issue of material fact concerning disparate treatment.

At the Second TSM Position opening, while Agustin was visibly Caucasian, female, and pregnant during her interview, the three panel members assert that none of these factors entered into the interview panel's decision to not promote her. Fair Decl. ¶ 17; Brandon Decl. ¶¶ 11, 12; Fitzgibbon Decl. ¶ 8. Moreover, although Agustin felt that Fair's inquiry about how Agustin's baby was doing before the interview was an "unfair

question," Agustin Decl. ¶ 22, it is more reasonably interpreted as small talk. See Fair Decl. ¶ 12.  While Daley's comment that Agustin would be too busy with a baby appears to have been a poorly attempted effort to console her, it was made after Chan was selected over Agustin.  See Agustin Decl. ¶ 25.  In any event, Daley had no part in the selection for the Second TSM Position and no authority to grant Agustin any subsequent TSM position.  Daley Decl. ¶¶ 10, 11.

Daley also establishes that the timing and location of Agustin's interview was an unrelated logistical error on his part.  Id. ¶¶ 12-16; see also Def. Exs. 7 & 8; Fair Decl. ¶ 10. While it is true that the prior interviews that day occurred in a conference room, other candidate interviews in the past had been conducted in Okinaka's office.  See Brandon Decl. ¶ 9. Moreover, Daley was not involved in the interviews or selection process for the Second TSM Position except for the scheduling and therefore did not participate in the non-selection of Agustin.  Daley Decl. ¶ 17.

Finally, Agustin's allegation that the person selected for the vacancy was a less qualified Asian male is also insufficient to establish a prima facie case or evidence of discriminatory intent.  Agustin has admitted that she has no knowledge of Chan's experience compared to hers.  See Def. Ex. 13 (Agustin Deposition) at 33:13-16; see also CSF in Opp. ¶ 27

16

(deemed admitted).  It is clear that the interview panel did not find Kingston Chan to be less qualified than Agustin-in fact, he scored 30 out of 30 in his interview evaluation and was ranked first while Agustin scored 25 out of 30 and was tied for sixth place.  Fair Decl. ¶¶ 7-13.

In sum, Agustin has not presented "direct or circumstantial evidence of discriminatory intent."  Vasquez v. Cty. of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003).  She has also not presented evidence sufficient to establish a prima facie case under the McDonnell Douglas framework because she failed to show circumstances surrounding the adverse employment action give rise to an inference of discrimination.

### ii. Non-Discriminatory Reason

Even assuming Agustin met her burden of establishing a prima facie case of disparate treatment, Defendant has nonetheless set forth a legitimate, non—discriminatory reason for Agustin's non-selection:  in both circumstances, the more qualified candidate was selected, recommended, and approved.

With the First TSM Position where Agustin tied for the highest interview score, the position was offered to the other candidate because he had more checkpoint experience than Agustin.  Daley Decl. ¶ 8.  Agustin's job description as a BDO included observation of passenger behavior at checkpoints and reporting suspicious behavior, with minimal interaction with

management and passengers.  Id.  While Agustin did have experience with screening as a TSO, it had been nearly a decade since she had held that position.  See Def. Ex. 6.

The male candidate who was chosen over Agustin, on the other hand, had experience working at the checkpoints and applying TSA checkpoint policies and procedures.  Daley Decl. ¶ 8.  Because he had more concrete checkpoint experience and was therefore more qualified for the position, that particular male candidate was selected over Agustin.

With the Second TSM Position, the interview panel ranked Agustin in a tie for sixth out of eleven candidates, with a score of 25 out of 30.  Fair Decl. ¶ 13; see Def. Ex. 6.  The panel felt that while Agustin demonstrated general management skills, she did not have the operational experience related to screening and baggage.  Fair Decl. ¶ 13.  The panel ranked Kingston Chan first out of the eleven candidates, with a score of 30 out of 30.  Id. ¶¶ 7-9.  The interview evaluations and score cards reflect that Chan demonstrated strong leadership skills and had solid experience in passenger and baggage screening, which was a specific requirement for the Second TSM Position.  Id. ¶ 8.  As Defendant asserts, Agustin may have had the experience described in her declaration, but she did not adequately communicate it well in her interview.  Reply at 3.  Agustin may have been qualified for the Second TSM Position,

18

however, among the eleven candidates interviewed, she scored in the middle, demonstrating that the panel members each thought she was not the most qualified.  And it is notable that while Agustin attempts to challenge the credibility of Fair, she does not challenge the credibility of Brandon and Fitzgibbon.

Based on these facts, the Court finds that Defendant's selection of the other candidates based on superior qualifications was a legitimate, non-discriminatory reason for Agustin's non-selection.

### iii. Pretext

Still assuming that Agustin established a prima facie case of disparate treatment, the burden shifts back to Agustin to show that Defendant's stated reason for selecting the most qualified candidate is mere pretext.  See Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105-06 (9th Cir. 2008).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Dep't of Fair Emp. & Hous. V. Lucent Techs., Inc., 642 F.3d 728, 746 (9th Cir. 2011) (quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998)).  If a plaintiff uses circumstantial evidence to satisfy this burden, such evidence "must be specific" and "substantial."  Id.

19

Agustin has not offered evidence that would carry her burden of showing that Defendant's justification was pretextual. Agustin fails to identify evidence that would either directly persuade the Court that a discriminatory reason more likely motivated Defendant or indirectly demonstrate that Defendant's proffered explanation is unworthy of credence.  See Campbell v. Hawaii Dep't of Educ., 892 F.3d 1005, 1022 (9th Cir. 2018).

While Agustin has argued that she has greater experience than Chan and that there are "inconsistent reasons" for her non-selection, Opp. at 14, she has also admitted that she has no knowledge of Chan's experience compared to hers.  See Def. Ex. 13 (Agustin Deposition) at 33:13-16; see also CSF in Opp. ¶ 27 (deemed admitted).  As discussed supra, the applications of Agustin and Chan in conjunction with the panelists' notes and score sheets for the interviews demonstrate that Chan articulated greater baggage claim experience, progressive leadership, and ideas to implement improved policies.  See Def. Exs. 6, 10, 11, 12.

Moreover, Agustin's argument that there are material issues of fact regarding the credibility of Daley and Fair is not sufficient to deem their explanation of selecting the most qualified applicant as "unworthy of credence."[4/]  See Villiarimo

---

[4/]  Again, it is notable that Agustin does not challenge the credibility of panel members Brandon and Fitzgibbon.

v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002).
Further, in judging whether the proffered justifications were
false, it is not important whether they were objectively false;
rather, courts "only require that an employer honestly believed
its reason for its actions, even if its reason is foolish or
trivial or even baseless." Id. (internal citation and quotation
marks omitted).

Agustin argues that Daley denied promising her the
next TSM position even though Alo wrote in an email that Daley
"recalled telling [Agustin] that [she] was next for that
vacancy." See Pl. Ex. E; see also Opp. at 16. But Daley's
declaration is clear that if the other TSM individual
contemplating retirement did retire while the First TSM Position
posting was still open, he would recommend her "because she was
ranked second highest overall." Daley Decl. ¶ 9. When the
retirement was announced after the First TSM Position posting
expired, Daley further cautioned Agustin that she would have to
reapply to the new TSM posting, but if she gave similar answers
and if she gained more experience in screening "she would again
be a top candidate." Id. ¶¶ 9, 10. In fact, Agustin
substantiates Daley's declaration and contradicts her own
position, acknowledging in her email to Alo when she stated that
"Bill Daley told me that if there was an opening in the next six
months that the position was mine. I find it kind of strange

21

that just a few days after that 6 months was over they posted the position."  Pl. Ex. E.

Additionally, Agustin claims that she was not selected because Defendant thought she showed inflexibility and rigidness in how she handled her interview.  Opp. at 17.  In his declaration, Daley explained that he learned after the fact that Agustin had an issue with interviewing in Okinaka's office, and he wondered if she would have been able to handle the stressful TSM position if she could not handle being interviewed in an office rather than a conference room.  Daley Decl. ¶ 21.  However as discussed supra, Daley was not involved in Agustin's non-selection for the Second TSM Position and this comment was made after Chan had already been selected and approved.

Agustin's arguments regarding Fair's credibility likewise fail.  Agustin accuses Fair of changing her testimony regarding the comments made before the interview began.  Opp. at 16.  But Fair's testimony on the subject is consistent, although not precisely the same wording.  Compare Def. Ex. H ("I do recall asking her how she was feeling and if she and the baby had been doing ok"), with Fair Decl. ¶ 9 ("I also attempted to make small talk with Ms. Agustin, and I asked how her baby was doing.").

Agustin has failed to meet her burden to show pretext at this stage of the burden-shifting framework, and that failure

22

is fatal to her claims "irrespective of whether [s]he made out a prima facie case for discrimination." <u>Black v. Grant Cty. Public Utility Dist.</u>, 820 F. App'x 547, 550 (9th Cir. 2020).

### b. Disparate Impact

The Court next turns to Agustin's disparate impact theory of discrimination.  "[T]o make a prima facie case of disparate impact under Title VII, the plaintiff [] must show that a facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." <u>Paige v. California</u>, 291 F.3d 1141, 1144 (9th Cir. 2002) (internal quotation marks omitted).  The plaintiff must therefore demonstrate "(1) a specific employment practice that (2) causes a significant discriminatory impact." <u>Id.</u> at 1145. "Plaintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact." <u>Stout v. Potter</u>, 276 F.3d 1118, 1124 (9th Cir. 2002).

As an initial matter, Agustin's challenge to a specific employment practice appears to be the alleged HNL TSA interview trend for filling TSM positions.  Agustin has offered statistical evidence she believes demonstrates a significant discriminatory impact.  For a plaintiff to rely on statistical evidence to establish a prima facie case of disparate impact,

23

the "statistical disparities must be sufficiently substantial
that they raise such an inference of causation." Stout, 276
F.3d at 1122 (quoting Watson v. Fort Worth Bank & Tr., 487 U.S.
977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988)).  Statistical
evidence can only create a triable issue of fact where there is
a reliable sample size and it presents a "stark pattern" and can
"account for possible nondiscriminatory variables, such as job
performance." Aragon v. Republic Silver State Disposal, Inc.,
292 F.3d 654, 663 (9th Cir. 2002).

     Where the sample size is too small, a court will not
make statistical inferences of intentional discrimination.  See,
e.g., Aragon, 292 F.3d at 662 (declining to find statistical
inference of discrimination where three of the four garbage
collectors laid off were white); Sengupta v. Morrison-Knudsen
Co., Inc., 804 F.2d 1072, 1075 (9th Cir. 1986) (declining to
give weight to statistical evidence showing that from a pool of
28 total employees, four out of five dismissed employees were
African American).

     In her Opposition, Agustin relies on interrogatory
responses supplying employment statistics to "show that the
TSM's [sic] at Honolulu Airport are predominately and
disproportionately male." Opp. at 4; see Pl. Ex. D.  Agustin
argues "[d]uring 2016 they show there were only 5 women as TSM's
[sic] as compared to 14 males working in Honolulu airport. . .

24

in 2015 statistics show there were only 5 women compared to 11 men as TSM in Honolulu . . . From 2015 to 2016, five males were promoted to be TSMs, no women."  Opp. at 12.

First, the Court is unable to take any meaningful extrapolations from a data set of this size.  In <u>Freyd</u>, where the Ninth Circuit found the plaintiff's statistical evidence sufficient to establish a prima facie case of disparate impact, the proffered statistics covered a ten-year period, which amounted to "a data set that included 125 data points" and a "99 percent degree of confidence."  <u>Freyd</u>, 990 F.3d at 1218.  In comparison, Agustin's statistics cover only a two-year long period and provide a very small sample size.

Second, Agustin's evidence presents neither a stark pattern nor does it account for nondiscriminatory variables.  In <u>Freyd</u>, plaintiff's retained economist performed a regression analysis[5/] of the data and controlled for other variables such as "years in rank and time trends."  <u>Id.</u>; <u>see also</u> <u>Stout</u>, 276 F.3d at 1123 (concluding that even if the data were reliable, it did not reveal a disparate impact because the percentage of women selected was roughly proportional to the percentage of female applicants); <u>Contreras v. City of Los Angeles</u>, 656 F.2d 1267,

---

[5/]   A regression analysis is "a common statistical tool . . . designed to isolate the influence of one particular factor—[e.g.,] sex—on a dependent variable—[e.g.] salary."  <u>E.E.O.C. v. General Tel. Co. of Nw., Inc.</u>, 885 F.2d 575, 577 n.3 (9th Cir. 1989).

1272 (9th Cir. 1981) (discounting plaintiff's statistical evidence because the results "were not statistically significant when tested at a 0.5 level of significance").  Agustin's statistical evidence is therefore insufficient as a matter of law to sustain a prima facie case of disparate impact.

Even assuming Agustin could establish a prima facie case of disparate impact, as discussed supra, Agustin has not offered evidence that would carry her burden of showing that Defendant's justification was pretextual.

In sum, Agustin's promotion-related discrimination claims rely on weak circumstantial evidence insufficient to satisfy her burden.  Because Agustin has not established a prima facie case of disparate impact or disparate treatment based on her race, sex, or pregnancy-alone or in combination-and even if she had, she has not shown pretext, the Court GRANTS Defendant Mayorkas summary judgment on Agustin's Title VII discrimination claims.

## II.  Title VII Retaliation Claim (Count II)

The Court next addresses Agustin's claim that she was retaliated against because of her email to Agnew inquiring about the delay with her 3% raise.  Compl. ¶¶ 33-34.  On summary judgment, Defendant argues that Agustin did not engage in protected activity, and even if she did, there is no causal

connection between Agustin's email and her non-selection.  Mot. at 20, 21.  The Court again agrees.

### a. Prima Facie Case

To prevail on her retaliation claim, Agustin must show that "(1) [s]he engaged or was engaging in activity protected under Title VII, (2) the employer subjected h[er] to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir. 1987); see also Vasquez, 349 F.3d at 646.

The parties agree that Agustin complained to her supervisor Alo and raised the possibility of discrimination, but Agustin sent that email to Alo after the announcement that Chan had been selected.  See Pl. Ex. E.  The parties dispute whether Agustin engaged in protected activity when she emailed Agnew about her delayed raise in August of 2016.

### i. Protected Activity

In order to be deemed protected activity, "the opposed conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." Learned v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988); see also Stucky v. Dep't of Educ., 283 F. App'x 503, 505 (9th Cir. 2008) (finding that union grievances do not qualify as protected activities

because the record does not establish that they were lodged in opposition to Title VII violations).

Employers are prohibited from retaliating against employees for voicing complaints about discrimination.  See Crawford v. Metro Gov't of Nashville & Davidson Cty., Tenn., 555 U.S. 271, 276, 129 S. Ct. 846, 851, 172 L. Ed. 2d 650 (2009).  A complaint "need not specify 'discrimination' or other 'magic words' to qualify as protected activity."  Newell v. Heritage Senior Living, LLC, Civ No. 12-6094, 2016 WL 427371, at *7 (E.D. Pa. Feb. 3, 2016) (quoting Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 727 (7th Cir. 2003)), aff'd, 673 F. App'x 227 (3d Cir. 2016).

The U.S. Supreme Court has ruled that "offhand comments, and isolated incidents (unless extremely serious)" do not amount to discrimination.  Clary Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). If a person has been subjected to only an isolated incident, "a complaint about that incident does not constitute protected activity unless a reasonable person would believe that the isolated incident violated Title VII."  E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 963 (9th Cir. 2009).  The reasonable person determination requires "[l]ooking at all the circumstances, including the frequency of the discriminatory

28

conduct [] [and] its severity." Breeden, 532 U.S. at 270-71, 121 S. Ct. 1508 (internal quotation marks omitted).

In 2016, Daley authorized the 3% pay raise for Agustin and the two other SBDOs.  Enoka Decl. ¶ 7.  By July 24, 2016, the other two SBDOs received the 3% raise but Agustin did not. Id. ¶¶ 8, 9.  On August 29, 2016, after not receiving a fast enough explanation from her supervisor, Agustin then sent an email to Agnew about the delay in the payment of the raise.  See Pl. Ex. A.  The email reported she had been told by her management team that she and the other two SBDOs would receive the increased 3% pay on August 21, 2016; and she stated the other two had received the increase on that date (that is, one week earlier than the designated date in her email to Agnew). Id.  Agustin in fact retroactively received the 3% raise on August 7, 2016.

In her email to Agnew, Agustin expressed frustration with the delay in receiving her raise.  See Pl. Ex. A at 3 ("It has been two weeks and I have yet to have an answer for the reason of delay.").  She also suggested the possibility that "the employee who was processing the information deliberately 'made an error'" on her form but "properly processed and sent over the other two."  Id.  Agustin's email did not in any way allege that she believed the delay to be discriminatory or otherwise implicate a violation of Title VII.

Agustin could not reasonably have believed that she
was discriminated against in violation of Title VII because of
this brief delay in receiving the increased payment which had
been previously authorized, and therefore, she cannot reasonably
claim that she was retaliated against for opposing
discrimination prohibited by Title VII.  See Bentzien v. City &
Cty. of Honolulu, 334 F. App'x 817, 818 (9th Cir. 2009)
("Bentzien's claim based on Elizabeth Char's mocking of the
physically challenged fails because it was unreasonable for
Bentzien to believe that Char's individual act of discrimination
constituted an unlawful employment practice.").

### i.  Causal Link

Even assuming Agustin's email to Agnew about her
delayed raise constituted protected activity, she has failed to
establish the third element of a prima facie case of
retaliation:  a causal link between the protected activity and
the employer's action.

The plaintiff must establish that her protected
activity was a but-for cause of the alleged adverse action by
the employer.  Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S.
338, 360, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013); see
also Lombardi v. Castro, 675 F. App'x 690, 691-92 (9th Cir.
2017).  "Essential to a causal link is evidence that the
employer was aware that the plaintiff had engaged in the

protected activity." Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).

Agustin contends that she was not promoted as retaliation for her emails inquiring about the delay in her 3% raise. Compl. ¶ 34. Okinaka was copied on Agustin's email to Agnew; while Daley and Fair were copied on an earlier email from Enoka to Agustin on the same subject. See Pl. Ex. A. However, Agustin has failed to raise a genuine issue of material fact that the appointing official-Cy Okinaka-considered Agustin's email to Agnew about her raise in his decision to affirm Fair's recommendation of Chan to the Second TSM Position. Indeed, Agustin's name was not presented to Okinaka as the recommended candidate either time. Furthermore, it was Okinaka's practice to approve the recommendation unless he was aware of some facts that would disqualify the candidate. Okinaka was not involved in the selection process until the interviews had been held and Agustin had been ranked as tied for sixth, so her name was not even presented Okinaka for his consideration. Okinaka's decision to approve Fair's recommendation was based "solely on the fact that Mr. Chan was the highest scoring and highest ranked applicant" and Agustin's email "played no role in [] approving Mr. Chan's promotion." Okinaka Decl. ¶¶ 11, 12.

Likewise, even though they were copied on an earlier email from Enoka to Agustin related to Agustin's delayed raise,

31

Daley was not involved in the selection process for the Second TSM Position and the delay in Agustin receiving her 3% raise payment occurred well after the First TSM Position.  And Fair states that Enoka's earlier email did not factor into her interview evaluation of Agustin.[6/]  See Fair Decl. ¶ 18. Fitzgibbon and Brandon-who were on the Second TSM Position panel along with Fair-were not copied on Enoka's email or on Agustin's email chain and her raising the delay in receiving the 3% pay raise did not factor into their decision.  Fitzgibbon Decl. ¶ 8; Brandon Decl. ¶ 13.

To the extent that Agustin relies on temporal proximity to demonstrate causation, the timeline itself is not disqualifying but Agustin fails to establish the required additional evidence.  Temporal proximity between an employer's knowledge of protected activity and an adverse employment action is sufficient to establish a prima facie case, but the temporal proximity must be "very close."  Breeden, 532 U.S. at 273; see, e.g., Govan v. Sec. Nat. Fin. Corp., 502 F. App'x 671, 674 (9th Cir. 2012) (6-month period insufficient); Swan v. Bank of Am., 360 F. App'x 903, 906 (9th Cir. 2009) (4-month period insufficient).  The Ninth Circuit has "caution[ed] that a

_____

[6/]  If Fair or Okinaka read Agustin's email to Agnew, they would have concluded that the matter was a dead issue since Agustin reported that she had been told by her management team that she would receive the pay increase on February 21, 2016, and in fact she retroactively received the increase earlier on August 7, 2016.  See Pl. Ex. A.

specified time period cannot be a mechanically applied criterion," because "[a] rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003).

Here, the alleged protected activity-Augstin's email to Agnew about the delay with her raise-occurred in August of 2016. See Pl. Ex. A. The First TSM Position opened on January 26, 2016, before Agustin's email. See Def. Ex. 4. The Second TSM position opened on August 30, 2016, see Def. Ex. 5, and Agustin interviewed on November 2, 2016. See Def. Ex. 10. Shortly thereafter, Fair recommended Chan to Okinaka. Fair Decl. ¶ 15. By the time Chan was selected, it had been around three months since Agustin's email in question. See Pl. Ex. E.

While the lapse in time does not preclude an inference of causation, Agustin must adduce "additional evidence" to prevail at this stage. Coszalter, 320 F.3d at 977; see also Black, 820 F. App'x at 551 ("While not conclusive on its own, the timeline of Black's termination supports an inference of causation."). Additional evidence may be in the form of a showing that the "employer's proffered explanations for the adverse employment action were false and pre-textual." Coszalter, 320 F.3d at 977.

Agustin has not come forward with any additional evidence to prevail at this causation stage, and as discussed supra, Agustin has not shown that Defendant's non-discriminatory reason of selecting the candidate with the highest scores and best experience is mere pretext.   See id.; Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 n.8 (9th Cir. 2006) ("When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a McDonnell Douglas type presumption.").

In sum, taking Agustin's factual allegations as true, and drawing all legitimate inferences in her favor, Agustin has not established a genuine issue of material fact as to whether she was retaliated against in violation of Title VII.   Agustin is unable to carry her burden of establishing that her emails regarding her delayed raise constitutes protected activity, and even assuming the emails were protected activity, she has failed to show a causal connection.

The Court therefore GRANTS Defendant's motion for summary judgment with regard to Agustin's Title VII retaliation claim.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court GRANTS Defendant Mayorkas's Motion for Summary Judgment, ECF No. 35. There being no remaining claims in this case, the Clerk's Office is DIRECTED to enter judgment and close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, March 7, 2022.



_____
Alan C. Kay
Sr. United States District Judge

<u>Prowse v. Mayorkas</u>, Civ. No. 21-00057 ACK-WRP, Order Granting Defendant's Motion for Summary Judgment, ECF No. 35.